# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| PATRICIA POMEROY, ENOCH ANDERSON, <br><br> Plaintiffs, <br><br> vs. <br><br> GREATBANC TRUST COMPANY, an Illinois Corporation, CAPITAL MANAGEMENT ASSOCIATES, an Illinois Corporation, CHARLES J. DUSHEK, CHARLES S. DUSHEK, <br><br> Defendants. | Case No. <br><br><br> TRIAL BY JURY DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs Patricia Pomeroy and Enoch Anderson, by their attorneys, for their Class Action Complaint, state as follows:

## NATURE OF THE ACTION

1.      This is a class action on behalf of account holders of GreatBanc Trust Company accounts which were jointly managed by Defendants Capital Management Associates ("CMA"), GreatBanc Trust Company ("GreatBanc") and Charles J. Dushek ("Charles Dushek Sr.") between the years 2003 and 2012.  At all times relevant, Defendants CMA and GreatBanc had offices in the same building in Lisle, Illinois, as well as a referral arrangement pursuant to which CMA's investment advisory customers opened accounts with GreatBanc, which were co-managed by CMA and GreatBanc for a fee and additional shared compensation for transactions, including transactional fees for the sale and purchase of securities in the accounts.

2.      From 2003 until approximately August 2012, Defendants engaged in and otherwise

1

participated in the individual defendants' violations of securities laws by engaging in a fraudulent "cherry-picking" scheme in the Plaintiffs' GreatBanc accounts and the GreatBanc accounts of the putative class (defined herein). Defendants Charles Dushek Sr. and Charles S. ("Chas") Dushek carried out their scheme through CMA and GreatBanc by assigning profitable trades to themselves and unprofitable trades to CMA clients' GreatBanc accounts. Instead of following industry standards and allocating trades at the point of sale, GreatBanc knowingly allowed and actively assisted Charles and Chas Dushek in allocating trades after several days had passed and the profitability of the trades had been determined (the "Cherry-Picking Scheme").

3.      Plaintiffs seek monetary relief for the economic loss they have sustained due to Defendants' securities law violations.

## PARTIES AND JURISDICTION

4.      Plaintiffs Patricia Pomeroy and Enoch Anderson are residents of Illinois and have continuously, throughout all times relevant hereto, held investment accounts at GreatBanc jointly managed by Defendants CMA, GreatBanc, Charles Dushek Sr. and Chas Dushek.

5.      Defendant GreatBanc is an Illinois corporation with a principal place of business in DuPage County, Illinois. GreatBanc was incorporated to execute trusts and is a non-depository trust company engaging in trust, fiduciary and custody activities. At all times relevant, GreatBanc acted as a partner with Defendant CMA in providing trust, fiduciary and agency services to CMA clients, managing the client GreatBanc accounts and performing the execution, allocation and monitoring of securities transactions in those accounts. GreatBanc is a subsidiary of U.S. Fiduciary Services, Inc. ("USFS").

6.      Defendant CMA is an Illinois corporation and registered investment adviser with a principal place of business in DuPage County, Illinois.

2

7.    Defendant Charles Dushek Sr. is the president, owner and head of compliance for CMA and a registered investment adviser. Mr. Dushek owns CMA with his wife, Marge Dushek. Mr. Dushek acted as the supervisor of all CMA client accounts and as the investment manager of Plaintiffs' accounts with CMA and Defendant GreatBanc. Mr. Dushek resides in DuPage County, Illinois.

8.    Defendant Chas Dushek is the son of Defendant Charles Dushek Sr. and an employee of CMA. Chas Dushek resides in DuPage County, Illinois. (Hereafter, Charles Dushek Sr. and Chas Dushek are collectively referred to as "the Dusheks."). Defendants Charles Dushek Sr. and GreatBanc allowed Chas Dushek, to manage and trade in clients' GreatBanc accounts despite the fact that Chas has never been a registered investment adviser representative and has never held any securities licenses.

9.    Marge Dushek, a non-party, is the wife of Charles Dushek Sr. and co-owner of Defendant CMA.

10.    SEI Investments Company ("SEI"), a non-party, performed the clearing of the investment transactions in the GreatBanc accounts.

11.    U.S. Fiduciary Services, Inc. ("USFS"), a non-party, is an Illinois Corporation and the holding company of Defendant GreatBanc. U.S. Fiduciary Services has the same office address as GreatBanc in Lisle, Illinois.

12.    This Court has exclusive jurisdiction over this matter pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78aa(a) (the "Exchange Act"). Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce, the means and instruments of communications in interstate commerce, including the United States

mails and interstate telephone communications, in connection with the acts, practices and courses of business that are the subject of this Complaint.

13.     Venue in this district is proper pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391(b) as a substantial part of the events or omissions giving rise to this action occurred in the Northern District of Illinois and all of the defendants are inhabitants of, are found in and/or otherwise transact business in the this District.

## CLASS ACTION ALLEGATIONS

14.     Plaintiffs bring this case as a class action on behalf of the class of persons, defined as follows: "All persons who held GreatBanc accounts co-managed by GreatBanc, CMA and Charles Dushek Sr. between the years 2003 and 2012 and who have suffered damages from 2003 until 2012 when the Plaintiffs discovered the aforesaid conduct of Defendants and where those damages were caused by the Cherry-Picking Scheme and Defendants' violations of U.S. securities laws."

15.     Plaintiffs are informed and believe that there are hundreds of members of the putative class as described above, although the precise number and identities of the class members are currently unknown to Plaintiffs.

16.     The members of the putative class are so numerous that joinder of all members is impracticable.

17.     Questions of fact and law as to all putative class members predominate over any questions affecting any individual member of the putative class, including, but not limited to:

    a.  Whether Defendants have directly violated U.S. securities laws ; and,

    b.  Whether Defendants have indirectly violated U.S. securities laws or otherwise participated in each Defendants' individual violations of securities laws ; and,

c. What dollar amount of unjust profits and fees did Defendants earn through the Cherry-Picking Scheme; and,

d. Whether the unjust profits are traceable to any other entities or individuals and subject to a constructive trust.

18.     Plaintiffs and the putative class' claims are typical of the claims of the putative class, because the Cherry-Picking Scheme and Defendants' violations of securities laws concerning the trading and allocation of trades in the GreatBanc accounts affected Plaintiffs and the putative class uniformly and in precisely the same manner.

19.     Plaintiffs will fairly and adequately represent and protect the interests of the putative class. Plaintiffs have retained experienced class action counsel.  The interests of Plaintiffs are coincident with and not antagonistic to the interests of the putative class members.

20.     The questions of law and fact common to the members of the putative class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

21.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because joinder of all putative class members is impracticable. Moreover, because the damages suffered by individual members of the putative class may be relatively small, the expense and burden of individual litigation makes it impossible for the members of the putative class to redress the wrongs done to them individually.

22.     Finally, the putative class is readily definable and prosecution of the action as a class action will eliminate the possibility of repetitious litigation. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE FACTS COMMON TO ALL CLAIMS

### BACKGROUND

23.     Charles Dushek Sr. is, and at all times relevant was, personal friends with the management at GreatBanc and USFS. They would regularly attend social events together including parties that Charles Dushek Sr. and Marge Dushek threw at their luxury home.

24.     At all times relevant, CMA, GreatBanc and USFS were located in the same office building in Lisle, Illinois.

25.     CMA and GreatBanc had a referral agreement with one another pursuant to which Charles Dushek Sr. required his CMA clients to open accounts at GreatBanc.

26.     Plaintiffs each individually entered into an Investment Advisory Agreement with CMA pursuant to which CMA and Charles Dushek Sr. were to act as Plaintiffs' registered investment advisers.

27.     Due to the referral agreement between CMA and GreatBanc, Charles Dushek Sr. required Plaintiffs to open multiple GreatBanc accounts to be co-managed by CMA and GreatBanc for an asset-based fee and a split commission on all securities trading activity in the accounts ("Plaintiffs' GreatBanc Accounts"). But for the referral agreement, Plaintiffs would not have opened accounts with GreatBanc.

28.     In its form ADV filed with securities regulatory agencies, CMA disclosed that it utilized the custodial services of GreatBanc for effecting securities transactions for GreatBanc accounts co-managed by CMA and GreatBanc. The form ADV also specified that GreatBanc received a fee of three cents per share for each trade cleared in GreatBanc accounts.

29.     Through their common office space, referral arrangement, co-management agreements, representations to securities regulators, representations to Plaintiffs and shared financial gain in Plaintiffs' GreatBanc Accounts, CMA and GreatBanc created the apparent and

6

factual joint enterprise of investment, trust, custodial and fiduciary services to Plaintiffs relative to their GreatBanc accounts and were further engaged in the business of effecting transactions in securities in the Plaintiffs' GreatBanc accounts.

## THE CHERRY-PICKING SCHEME

### *The Placement of Overlapping Trades through a Master Account*

30.     CMA and Charles Dushek Sr. had full discretion to make trades in Plaintiffs' GreatBanc Accounts.

31.     Due to that full discretion, Defendants had heightened duties of utmost good faith, fair dealing and undivided loyalty to Plaintiffs.

32.     Defendants had control over the investments in Plaintiffs' GreatBanc Accounts.

33.     Charles and Chas Dushek did, in fact, make trades in Plaintiffs' GreatBanc Accounts at their discretion without any prior consultation with Plaintiffs.

34.     While co-managing Plaintiffs' GreatBanc Accounts, CMA also co-managed GreatBanc accounts held by Charles, Marge and Chas Dushek. The Dushek family had at least five accounts (the "Dushek Family Accounts").

35.     Using the Dushek Family Accounts, the Dusheks traded in the same investments and securities held by CMA clients in their GreatBanc accounts including Plaintiffs' GreatBanc Accounts.

36.     There was a high degree of overlap between investments held in the Dushek Family Accounts and the CMA clients' GreatBanc accounts.

37.     In its form ADV, CMA and Charles Dushek Sr. misrepresented to Plaintiffs and prospective clients that:

7

a. CMA used a separate trading platform to eliminate any conflicts of interest between client and proprietary and personal account trading;

b. This separate trading platform ensured CMA employees, agents or representatives did not make any contemporaneous trades with client and CMA accounts;

c. CMA did not merge or aggregate any client order with any employee order;

d. CMA did not make short term trades in any investment on the same day that CMA clients had open transactions in that same investment;

e. CMA's policy was to allocate investment opportunities on a fair and equitable basis relative to other accounts; and,

f. CMA was committed to doing all things in the offering and delivery of its services in a manner that is always in the best interests of the client.

38. Through its own due diligence, GreatBanc knew or should have known of the representations in CMA's form ADV.

39. By and through it relationship and agreements with CMA, GreatBanc was a party to CMA's misleading misrepresentations that concealed from Plaintiff's the nature of the Defendants' Cherry-picking scheme. Despite a substantial risk of misleading the Plaintiffs and causing them harm, GreatBanc never took any steps to inform Plaintiffs of the truth or provide Plaintiffs with additional information needed to make these statements not misleading under the circumstances under which they were made.

40. Contrary to CMA's misrepresentations, CMA and GreatBanc jointly allowed and facilitated Charles and Chas Dushek's use of GreatBanc's master account (the "GreatBanc Master Account") to make day trades in the Dushek Family Accounts and trades in accounts held by other CMA clients, including Plaintiffs' GreatBanc Accounts.

8

41.     GreatBanc, through its GreatBanc Master Account, permitted the Dusheks to make "block" purchases without making a payment from specific individual accounts until trades had been allocated and settled. Trades entered by the Defendants in the GreatBanc Master Account did not differentiate between purchases for the Dushek Family Accounts and purchases for other GreatBanc accounts.

42.     The GreatBanc Master Account allowed the Dusheks to make multi-account transactions through pooled "block" purchasing because the ability to pay for the block purchase was not assessed based on the value of any individual account, but on the total combined value of assets held in all of the clients' GreatBanc accounts.

43.     Use of the GreatBanc Master Account by the Dusheks allowed them to commingle client assets in unallocated trades with inadequate record keeping of the purchases.

44.     At the time of purchase, the Dusheks failed to designate or specify whether they were trading with client funds or funds from the Dushek Family Accounts, nor did they keep any written record. Thus, by making pooled "block" purchases, the Defendants effectively commingled client funds and assets with the funds in the Dushek Family Accounts and other GreatBanc accounts.

45.     GreatBanc knew that the Dusheks were using the GreatBanc Master Account to make undesignated block purchases and multi-account transactions and further knew that other CMA employees used order management software such as Moxy software, which required the user to designate the account making the purchase at the time of purchase. Accordingly, GreatBanc knew that the Dusheks' block purchases in the GreatBanc Master Account deviated from CMA's normal practice, CMA's representations concerning trading and GreatBanc's duty as a custodian and fiduciary to ensure that the assets in client accounts were not commingled.

### *The Allocation of the Trades*

46.    After making "block" purchases of pooled investments, Defendants needed to allocate the purchases to specific GreatBanc accounts.

47.    Defendants had the duty to allocate the purchase at the time the transaction was entered.

48.    Defendants failed to allocate specific purchases or sales to any specific account until after the trade was executed.

49.    When the trade was entered, the Dusheks and GreatBanc did not make any type of written record of whether they were placing the trades for a specific client account, multiple client accounts or for the Dushek Family Accounts. GreatBanc similarly did not keep any written records regarding the details of the trades made by the Dusheks.

50.    Prior to 2009, CMA and the Dusheks would typically make block purchases shortly after the market opened. CMA and the Dusheks were required to provide GreatBanc with the allocation of trades to specific accounts the same day.

51.    When the market price favored the block purchase creating an increase in value, the Dusheks would allocate the profitable trade to the Dushek Family Accounts, oftentimes selling the purchased block for profit within the same day.

52.    When the market went against the block purchase causing a loss in value, the Dusheks would select client accounts to allocate fractions of the purchase to and would then sell other assets in those client accounts to pay for the purchase. When the Dusheks did not sell enough assets in client accounts to cover the purchase by the end of the day of the trade, an overdraft would result.

53.    From 2007 to 2009, GreatBanc sent CMA nearly daily notices of overdrafts caused by the Dusheks' failure to sell enough client assets to cover the allocation of unprofitable trades to

their GreatBanc accounts. These daily overdraft notices were a serious red flag to GreatBanc that improper trading was taking place.

54.     From 2007 to 2009, CMA's daily overdraft balance was frequently between $300,000.00 to $600,000.00.

55.     GreatBanc earned profits from the overdrafts by charging CMA 6% interest on the overdraft balance.

56.     GreatBanc reached an agreement with CMA and Charles Dushek to not charge the client accounts for overdrafts but instead to charge CMA directly.

57.     GreatBanc failed to notify the clients of overdrafts occurring in their GreatBanc accounts and concealed the overdrafts by charging CMA directly for interest on overdrafts.

58.     Arnie Bruns and others at GreatBanc regularly told Charles Dushek Sr. and CMA to clear up overdrafts by the end of the month because GreatBanc's auditors would see the overdrafts if they were still open at the end of the month, which would raise a red flag.

59.     GreatBanc actively concealed the overdrafts from their auditors.

60.     Shortly before January 2009, CMA, through Charles Dushek Sr. and Chas Dushek, contacted various broker-dealers regarding taking trades on behalf of GreatBanc on a delivery verses payment ("DVP") basis.

61.     The Dusheks and CMA selected Charles Schwab ("Schwab") to trade through because Schwab offered special settlement options in addition to the customary three day settlements. These special settlement options included two day settlements, next day settlements and same day settlements.

62.     Schwab charged twice as much for special settlements compared to the rate for customary settlements.

63.     At the request of CMA and Charles Dushek Sr., GreatBanc opened an omnibus Schwab account in the name of GreatBanc for the purpose of permitting CMA and the Dusheks to trade at Schwab (the "GreatBanc Omnibus Account").

64.     By frequently using the special settlement options of same day, one day and two day settlements of trades, CMA and the Dusheks were able to nearly eliminate overdrafts and overdraft charges from GreatBanc.

65.     Defendants passed on the additional doubled commission and costs of special settlements to GreatBanc clients, including Plaintiffs and the putative class.

66.     Neither GreatBanc nor CMA disclosed to Plaintiffs or the putative class that the special settlement option was:

        a.  Being used by CMA;

        b.  Allowed CMA to avoid the overdrafts and overdraft charges GreatBanc was imposing on CMA;

        c.  Allowed GreatBanc to circumvent overdrafting red flags;

        d.  Charging Plaintiffs and the class twice as much to facilitate the special settlement of trades.

67.     As a result of GreatBanc opening the GreatBanc Omnibus Account to permit CMA and the Dusheks to use special settlement options, CMA and the Dusheks were able to wait as long as three days after purchasing a block of securities through the GreatBanc Omnibus Account to determine who to allocate the trade to and what to sell to cover the purchase of the block trade.

68.     For example, on December 29, 2010 Charles Dushek Sr. made six purchases in the GreatBanc Omnibus Account of 6,000 shares of H&R Block common stock at prices ranging from $11.6681 to $11.93 totaling $70,812.28.  These purchases had a normal settlement date of January

12

3, 2011. On January 3, 2011, Charles Dushek Sr. sold the 6,000 shares of H&R Block through the GreatBanc Omnibus Account at $12.10 per share, or $72,418.77, on a same day settlement basis, resulting in the settlement of the sale on January 3, 2011. Thus, the six purchases in the GreatBanc Omnibus Account on December 29, 2010 and the one sale of January 3, 2011 all settled on January 3, 2011 for a profit of approximately $1,606.49 less transaction costs.

69.    With the profits locked in and guaranteed in the opening purchase and closing sale of the H&R Block trade, Defendants allocated the purchase transactions to Charles Dushek Sr.'s own personal account on January 3, 2011 at 10:06 a.m. Defendants allocated the sale of the 6,000 H&R Block shares to Charles Dushek Sr.'s personal account on January 3, 2011 at 10:07 a.m. Thus, Charles Dushek Sr. made a 2.22% return on a riskless trade through the use of the GreatBanc Omnibus Account.

70.    At all times relevant, GreatBanc knew or should have known that the aforementioned purchase of 6,000 H&R Block shares by CMA and Charles Dushek was not allocated to any GreatBanc custodial account from the time of the purchase on December 29, 2010 until January 3, 2011.

71.    At all times relevant, GreatBanc knew of should have known that the aforementioned unallocated trade of H&R Block shares was a violation of their own record keeping requirement, their clearing broker SEI's requirements, as well as requirements under federal and state law.

72.    At all times relevant, GreatBanc knew or should have known that CMA and Charles Dushek Sr.'s allocation of the H&R Block trade was a breach of fiduciary duty to CMA and GreatBanc clients because it was allocated five days after the purchase and only after the closing

sale of the H&R Block shares had been executed, locking in the profit of the trade in Charles Dushek Sr.'s own account.

73. At all times relevant, GreatBanc knew or should have known that it had a duty to keep proper records and to segregate all client GreatBanc accounts and the assets held in those GreatBanc accounts.

74. During the time that a trade, such as the H&R Block trade, was not allocated, GreatBanc did not maintain proper records or properly segregate all GreatBanc client account assets.

75. It is standard industry practice and best practice in the investment management industry to have a written allocation policy and make allocation decisions at the time of purchase or immediately thereafter. It is also standard industry practice to not allow investment advisers to trade in the same stocks as their clients. Defendants were aware of these standard industry practices and best practices, but did not adhere to them.

76. Because GreatBanc knowingly allowed and enabled CMA and the Dusheks the ability to deviate from industry standards and best practices by allocating trades several days beyond the trade date, CMA and the Dusheks were able to determine what trades were profiting over the course of three to five days prior to making any decision on allocation.

77. Through GreatBanc, the Dusheks unfairly allocated trades that had appreciated in value to the Dushek Family Accounts. Conversely, through GreatBanc, the Dusheks unfairly allocated trades that had depreciated in value to the accounts of CMA clients, including Plaintiffs' GreatBanc Accounts.

14

78.     Once the Dusheks made the decision to allocate an unprofitable trade to a client account, the Dusheks would sell investments from that client's account to create cash to cover the delayed purchase.

79.     By selling and liquidating client investments to finance the Cherry-Picking Scheme, Defendants were using Plaintiffs' GreatBanc Account assets for their own benefit and not for the benefit of Plaintiffs.

80.     Defendants were unjustly enriched by the Cherry-Picking Scheme.

81.     Defendants received significant management fees and commissions on trades from clients who were disadvantaged by the Cherry-Picking Scheme.

82.     In or around 2008, to cover the loss of asset-based management fees created by the financial crisis, GreatBanc insisted on CMA raising transaction fees and giving GreatBanc 100% of the difference between the prior fee and the raised fee. Thus, GreatBanc encouraged a higher rate of trading to generate profit and received a fee in excess of the actual brokerage cost for sales and purchases of securities in GreatBanc accounts.

83.     Upon information and belief, between 2003 and 2012, the Dusheks made an average of five trades per day in the Dushek Family Accounts.

84.     From 2003 to 2012, the Dusheks placed well over 25,000 trades with an average of 75% of the trades allocated to the Dushek Family Accounts generating a profit and approximately 75% of the trades allocated to clients' GreatBanc Accounts generating losses.

85.     From 2008 to 2012, the Dusheks made upwards of $2,000,000.00 in profits through the Cherry-Picking Scheme while CMA clients suffered corresponding losses upwards of $2,000,000.00. Upon information and belief, the Dusheks made similar profits in the years from 2003 to 2008.

86.     In 2011 alone, Charles Dushek Sr. used the Cherry-Picking Scheme to obtain disbursements of up to ten times the amount of assets held in his personal GreatBanc account.

87.     Many of the unfairly allocated trades were going through Charles and Marge Dushek's GreatBanc accounts with returns in those accounts being 25,000% or more over several years.

88.     The Dusheks were able to generate such large returns in their personal GreatBanc accounts and take out large disbursements by using the leverage from client accounts to leverage the Dushek Family Accounts.

89.     At all times relevant the Dushek Family Accounts were cash accounts and/or retirement accounts that did not permit margin transactions.

90.     GreatBanc permitted the Dusheks to allocate purchases of securities into the Dushek Family Accounts that exceeded the funds available to make the purchase in the accounts.

91.     GreatBanc permitted the Dusheks to enter into day trades, or purchases and sales of the same securities settling on the same day when the Dusheks did not have the funds in the account to make the opening purchase transaction.

92.     The day trading without adequate funds to make the opening purchase was not a permissible transaction pursuant to 12 CFR 220.8(a)(1).

93.     The day trading in the Dushek Family Accounts should have resulted in a ninety day freeze of any new transaction s in the account without full payment being in the account at the time of the opening transaction and the cancellation of the transaction resulting in the day trade pursuant to 12 CFR 220.8(c).

94.     GreatBanc failed to freeze the Dushek Family Accounts or cancel any of the nearly daily day trades in the accounts, despite an obligation to do so.

16

95.    GreatBanc concealed the day trading activity occurring in the Dushek Family Accounts from its auditors and the regulators.

96.    In permitting the day trading and allocation of trades to the Dushek Family Accounts, GreatBanc extended credit for the purchase of securities in the Dushek Family Accounts that exceeded the maximum loan value of the collateral securing the credit in violation of 12 CFR 221.3.

97.    By permitting the day trading in the Dushek Family Accounts, GreatBanc willfully caused credit to be extended in contravention of Federal Regulations T and U (12 CFR 220 and 221).

98.    Alternatively, by permitting the Dushek Family Accounts to day trade, GreatBanc permitted the use of the assets of its custodial account clients to be used in the Dushek's day trading activity in contravention of the custodial duties to keep the assets segregated.

99.    Alternatively, by permitting the Dushek Family Accounts to day trade with the assets of the GreatBanc custodial accounts, GreatBanc put the custodial assets at risk of loss in contravention of the custodial duties of GreatBanc.

### *GreatBanc's Role in the Overall Scheme*

100.    Pursuant to the Investment Advisory Agreement between Defendants, Plaintiffs and the class members, GreatBanc:

     a.    Provided securities execution services relative to all securities transactions in the GreatBanc accounts;

     b.    Consummated all portfolio transactions in the Plaintiffs' GreatBanc accounts through payment and delivery of securities purchased and sold;

    c. Processed all securities settlements for the GreatBanc accounts on a transactional fee basis;

    d. Represented that the allocation of securities would be performed on a fair and equitable basis;

    e. Made block purchases of securities in the GreatBanc Master Account and GreatBanc Omnibus Account.

101. The Investment Advisory Agreement was attached and incorporated into an additional custodial agreement between GreatBanc, Plaintiffs and the putative class. Pursuant to that agreement, GreatBanc was designated to:

    a. Maintain GreatBanc accounts for all monies, stocks, bonds and other property held as assets in those accounts by Plaintiffs and the class;

    b. Invest and manage those assets, including securities;

    c. Maintain accurate records and accounts of all transactions in the GreatBanc accounts;

    d. Complete the receipt and delivery of all securities purchased and sold in the GreatBanc accounts;

    e. Take responsibility for the safekeeping of the assets held in the Plaintiffs' GreatBanc accounts;

    f. Buy, sell, receive and deliver the property held in the GreatBanc accounts, including securities.

102. Pursuant to the Investment Advisory Agreement incorporated into the custody agreements, GreatBanc had knowledge that CMA would provide Plaintiffs and the putative class its form ADV.

103. By incorporating the Investment Advisory Agreement into its custodial agreements, GreatBanc obtained knowledge of, and adopted, the representations made in those agreements, including the representations that all trades in the GreatBanc accounts would be allocated in a timely manner and on a fair and equitable basis.

104. Through their Investment Advisory Agreement, custodial agreements, representations, and apparent and actual joint enterprise for profit, CMA and GreatBanc were engaged in the business of effecting transactions in securities for the accounts of Plaintiffs' and the putative class and further engaged in the business of buying and selling securities for the GreatBanc Master Account and GreatBanc Omnibus Account.

105. GreatBanc earned a fee and a commission price for sale and purchase transactions relative to each GreatBanc account. This commission price was divided between GreatBanc and CMA until 2008, at which time GreatBanc began receiving 100% of the commissions on transactions. The transactional fees enjoyed by GreatBanc were as much as $4.25 per trade.

106. Due to this commission arrangement, CMA and GreatBanc profited by making trades and effecting transactions in securities in Plaintiffs' GreatBanc Accounts, regardless of whether or not those trades were in Plaintiffs' best interest or used simply to further the Cherry-Picking Scheme.

107. GreatBanc facilitated, effected and actively participated in the trades by performing execution services, consummating payment or delivery of securities, coordinating the trades with a clearing firm, completing the receipt and delivery of securities, and performing the allocation and settlement of trades from the GreatBanc Master Account and/or GreatBanc Omnibus Account to individual GreatBanc accounts.

108. GreatBanc represented to Plaintiffs that GreatBanc would:

a. Perform its services with the care, skill, prudence and diligence that a prudent person would use under the circumstances;

b. Take on the responsibility for the safekeeping of all assets held in Plaintiffs' GreatBanc Accounts;

c. Not assist CMA with any trading that violated any applicable laws or the standards of any regulatory or self-regulatory bodies; and,

d. Allocate trades in a timely manner and on a fair and equitable basis.

109. Contrary to these representations, GreatBanc and the Dusheks' made delayed allocations nearly every business day from the time Plaintiffs opened their GreatBanc Accounts until at least August 2012 while making excessive transaction fees on each sale and purchase of a security.

110. Mr. James Benz of GreatBanc acted as the account manager for each of Plaintiffs' GreatBanc accounts. GreatBanc performed the same management and allocation services for the Dushek Family Accounts.

111. GreatBanc instructed Plaintiffs and class members that any communication concerning Plaintiffs' GreatBanc Accounts was to go through CMA.

112. GreatBanc and Benz knew that CMA and the Dusheks were engaged in the delayed allocation Cherry-Picking Scheme. With this knowledge, GreatBanc willfully performed the delayed allocations, execution and settlement services for the purchases and sales of securities in Plaintiffs' GreatBanc accounts.

113. As a result of the failure to properly allocate trades at the time the transaction was entered, GreatBanc failed to keep proper records of the location of assets maintained in the GreatBanc custodial accounts under their control.

20

114. As a result of the failure to properly allocate trades at the time the transaction was entered, GreatBanc failed to keep segregated custodial account assets, but instead commingled custodial assets to facilitate the late allocation of trades in the GreatBanc accounts.

115. GreatBanc kept a record of the investments held in each GreatBanc account and the allocations to each account.

116. On a daily basis, GreatBanc, USFS and SEI sent or were included in emails to CMA which informed CMA:

    a. Trades were not being allocated in a timely manner;

    b. Trades should be allocated on the trade date;

    c. Specific trades, in the form of a list, that were about to settle and needed to be allocated;

    d. Trades which were unallocated on the settlement date would be "DK'd" – an industry term used to denote that one of the parties does not know about the trade; and,

    e. That they could not keep "DK'ing" trades.

117. Through this correspondence, GreatBanc concealed the red flags of problems represented by the designation of a transaction as "DK" and prevented its auditors and regulators from uncovering the "Cherry Picking" scheme. .

118. Upon information and belief, GreatBanc and USFS employees, agents or officers were regularly in communication with CMA and SEI through the above referenced emails concerning the delayed allocation. Namely, the following GreatBanc and USFS employees, agents or officers were parties to regular email correspondence concerning the late allocations:

    a. President and CEO of GreatBanc, James Staruck;

b.   Chairman of the GreatBanc Board of Directors, Vaughn Gordy;

c.   Former Vice President of GreatBanc, James Benz;

d.   Senior Vice President of GreatBanc, Robin Hanson;

e.   Senior Operations Specialist Brenda Reickert; and,

f.   Arnie Bruns.

119.   The same USFS and GreatBanc employees and agents were regularly included in emails from SEI which set forth lists of trades that needed to be allocated by CMA and GreatBanc by the end of the day.

120.   In response to the emails from GreatBanc, USFS and SEI, the Dusheks regularly provided spreadsheets listing trades that had yet to be allocated and marked those trades with "Hold Chas" or "Hold Chuck" to indicate that the trades would be allocated at a later date.

121.   GreatBanc also kept a log of the Dusheks' responses to the GreatBanc emails concerning improper allocations, which exposed that CMA did not have a legitimate excuse for failing to allocate trades and that Charles Dushek Sr. and Chas Dushek were giving conflicting reasons for the delays.

122.   By no later than January 1, 2009, GreatBanc and USFS charged CMA $500.00 for each time GreatBanc or USFS had to get involved with "End of Day" allocation and settlement issues.

123.   At no time did GreatBanc report the late allocation of trades to its GreatBanc custodial account holders who were subject to CMA's deceptive trading.

124.   In January 2010, GreatBanc and USFS reduced CMA's quarterly management fee for the last quarter of 2009 by $3,500.00. Thus, GreatBanc's solution to the late allocations was

not to report them to the client, but to make the situation more profitable for GreatBanc by imposing penalties upon CMA.

125.    By no later than 2011, GreatBanc met with CMA staff and discussed the large returns that Charles Dushek Sr. was reaping in his personal accounts compared to the returns earned by clients in their GreatBanc accounts.

126.    By no later than 2011, GreatBanc had instructed the Dusheks to implement a written trade allocation policy to comply with industry standards and sent the Dusheks an example of a written policy.

127.    CMA never implemented a written policy and affirmatively instructed GreatBanc that it would not.

128.    GreatBanc and CMA knew that a written policy for trade allocations was necessary to comply with industry best execution practices and willfully continued to allocate trades in a manner that violated those principals of best execution.

129.    At all times relevant, GreatBanc profited from the Dusheks violation of standard practices and perpetuation of the Cherry-Picking Scheme as it received as much as 100% of all the transaction based fee charges on the purchase and sale of securities, and higher commissions and fees related to Dushek family accounts.

130.    GreatBanc knew or should have known that Charles Dushek Sr. was not paid a salary in his capacity as president of CMA. GreatBanc also knew that the returns Charles Dushek Sr. was earning in his personal GreatBanc accounts were grossly disproportionate to the assets in those accounts and grossly disproportionate to the returns his clients were achieving in their GreatBanc accounts.

131.    Defendants did not disclose the Cherry-Picking scheme. Rather, GreatBanc allowed the scheme to continue and participated in the scheme at the expense of CMA and GreatBanc custodial account clients.

### The Structure of the Scheme Prevented Its Discovery

132.    GreatBanc facilitated the scheme by failing to keep proper records, including:

a. failing to maintain an effective system of records and controls regarding its customers' securities transactions to ensure safe and sound operations;

b. by failing to maintain a system that clearly and accurately reflects appropriate information and provides an adequate basis for audit;

c. by failing to maintain a chronological record of each purchase and sale of securities including the account or customers name for each transaction effected;

d. by failing to maintain account records of each customer reflecting the purchase and sale of securities;

e. by failing to maintain a separate memorandum (order ticket) of each order to purchase or sell securities (whether executed or cancelled) including the account or customer name for which the transaction was effected;

f. by failing to provide written notification to the customer at or before completion of the securities transaction that included the name of the bank, the name of the customer, the capacity of the bank, the date and time of execution of the security purchased or sold by the customer, the amount of remuneration that the customer has provided to any broker/dealer, directly or indirectly, in connection with the transaction;

g. by failing to provide written notification at or before completion of the securities transaction of the amount of remuneration that the bank has received or will receive from the customer, and the source and amount of any other remuneration that the bank has received or will receive in connection with the transaction;

h. by failing to provide to the customer a copy of the confirmation of a registered broker/dealer relating to the securities transaction;

i. by failing to keep the assets of custodial accounts separate from all other accounts, or identifying the investments as the property of a particular account.

133. GreatBanc prepared and generated monthly GreatBanc Account statements for Plaintiffs and the putative class that failed to provide a chronological listing of trades. As a result, Plaintiffs and the putative class could not determine from the face of the account statements whether Defendants were making improper trades, nor could Plaintiffs or the putative class decipher when particular investments were bought compared to the date that the same investment or a portion of that investment was sold.

134. Because Plaintiffs and the putative class did not have access to the Master Account or the account records of the Dushek Family Accounts, Plaintiffs and the putative class could not discover that Defendants were improperly:

a. Allocating profitable trades to the Dushek Family Accounts;

b. Allocating unprofitable trades to Plaintiffs' accounts and accounts held by the putative class;

c. Using Plaintiffs' assets and the assets of the Class to leverage the Dushek Family Accounts; and,

25

    d. Using Plaintiffs' assets and the assets of the putative class to generate large distributions from the Dushek Family Accounts.

135. At all times relevant, Defendants knowingly concealed and failed to disclose this improper activity from Plaintiffs and the putative class.

136. By making CMA the point of contact for all clients holding GreatBanc accounts co-managed by GreatBanc and CMA, GreatBanc put CMA and the Dusheks in a position to lie to clients about the trading activity in their accounts and perpetuate the fraud.

137. Due to the misrepresentations, concealment, lack of proper accounting and lack of confirmations, Plaintiffs and the putative class could not discover the Cherry-Picking Scheme until it had already ran its course in September 2012.

### *The U.S. Securities Exchange Commission Intercedes*

138. On May 16, 2013 the United States Securities and Exchange Commission filed civil action number 13-cv-3669 in the United States District Court for the Northern District of Illinois, alleging that CMA, Charles Dushek Sr. and Chas Dushek violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder through the Cherry-Picking scheme (the "SEC Action.").

139. CMA, Charles Dushek Sr. and Chas Dushek agreed to the entry of a judgment against them in the SEC action. Accordingly, on October 4, 2013, the SEC filed an Agreed Motion for the Entry of Judgment as to CMA, Charles Dushek Sr. and Chas Dushek.

140. On October 9, 2013, the U.S. District Court for the Northern District of Illinois entered consent judgment orders against CMA, Charles Dushek Sr. and Chas Dushek, ordering them to pay disgorgement of ill-gotten gains, prejudgment interest and civil penalties pursuant to Section 21(d)(3) of the Securities Exchange Act of 1934.

141.    On June 4, 2013, the U.S. District Court for the Northern District of Illinois entered a Final Judgment in the SEC Action finding that the Cherry-Picking scheme generated as much as $2,058,514.00 in ill-gotten profits gained and losses avoided.

## CLAIMS FOR RELIEF

### Count I
### Violations of Section 10(b) of the Securities Exchange Act
### of 1934 and Rule 10b-5 Thereunder (as to Defendant CMA)

142.    Plaintiffs incorporate paragraphs 1 through 141 as though fully restated herein.

143.    At all times relevant, Plaintiffs maintained their GreatBanc Accounts through CMA and GreatBanc.

144.    At all times relevant, CMA served as an investment advisor to Plaintiffs and the putative class and was engaged in the business of effecting transactions in securities in Plaintiffs' GreatBanc accounts.

145.    At all times relevant, CMA, directly or indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities as described herein, knowingly and recklessly:

a.    Employed devices, schemes or artifices to defraud;

b.    Made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or,

c.    Engaged in acts, practices and courses of business which operated as a fraud or deceit on Plaintiffs.

146.    CMA employed devices, schemes or artifices to defraud and otherwise engaged in acts, practices and courses of business which operated as a fraud or deceit on Plaintiffs by:

27

a.  Knowingly failing to supervise its agents and registered representatives who traded in or otherwise managed Plaintiffs' GreatBanc Accounts.

b.  Making delayed, unfair and inequitable allocations of profitable trades to CMA employee, owner and proprietary accounts including the Dushek Family Accounts;

c.  Making delayed, unfair and inequitable allocations of unprofitable trades to Plaintiffs' GreatBanc accounts and the GreatBanc accounts of the putative class;

d.  Excessively trading in Plaintiffs' GreatBanc Accounts in order to perpetuate the Cherry-Picking Scheme;

e.  Commingling client assets through block trades in the GreatBanc Master Account and GreatBanc Omnibus Account;

f.  Making investment decisions relative to the sale and purchase of securities in Plaintiffs' GreatBanc Accounts that were designed to benefit the Dusheks at the Plaintiffs' expense; and,

g.  Concealing the wrongful acts of its agents, employees, officers and registered representatives from Plaintiffs at all times relevant.

147. CMA misrepresented to Plaintiffs and prospective clients that:

a.  CMA used a separate trading platform to eliminate any conflicts of interest between client and proprietary and personal account trading;

b.  This separate trading platform ensured CMA employees, agents or representatives did not make any contemporaneous trades with client and CMA accounts;

c.  CMA did not merge or aggregate any client order with any employee order;

    d.   CMA did not make short term trades in any investment on the same day that CMA

clients had open transactions in that same investment;

    b.   CMA's policy was to allocate investment opportunities and trades on a fair and

equitable basis relative to other accounts; and,

    c.   CMA was committed to doing all things in the offering and delivery of its services

in a manner that is always in the best interests of the client.

148.    CMA also knowingly misrepresented to Plaintiffs that it would allocate trades in a

timely manner.

149.    CMA represented to Plaintiffs that CMA supervised the trading activities of its

agents, employees and investment advisors and had a compliance officer dedicated to such

supervision.

150.    Contrary to its representations, CMA knew that it did not have any means of

supervising the trading activity in the GreatBanc accounts in that:

    a.   Charles Dushek Sr. was the president and compliance officer for CMA and acted

as his own supervisor while also acting as the supervisor of Chas Dushek;

    b.   CMA had no policies or procedures to supervise Charles Dushek Sr. in any matter

whatsoever;

    c.   CMA had no policies or procedures to ensure the Dusheks allocated trades at or

near the time of execution;

    d.   CMA willfully refused to make a written allocation policy that would comply with

industry standards; and,

    e.   CMA had no policies to ensure the Dusheks were not disproportionately allocating

profitable trades to the Dushek Family Accounts while contemporaneously

allocating less profitable or unprofitable trades to Plaintiffs' GreatBanc Accounts and the GreatBanc accounts of the putative class.

151. CMA made omissions of the following material facts:

a. CMA was making block trades in securities through the GreatBanc Master Account and GreatBanc Omnibus Account, which commingled the assets of all GreatBanc accounts;

b. CMA was delaying allocations of trades until after the profitability of each trade had been fully determined;

c. The Dusheks were trading in securities in the Dushek Family Accounts that were also held by Plaintiffs in their GreatBanc accounts;

d. CMA did not supervise the Dusheks or the allocation of trades in the GreatBanc accounts to ensure trading in the GreatBanc accounts met best execution standards; and,

e. Chas Dushek was not licensed to trade securities, but was actively trading in GreatBanc accounts.

152. The above stated misrepresentations and omissions were material in that a reasonable investor would consider the matters important in making an investment decision and in allowing Defendants to effectuate securities transactions in the GreatBanc accounts.

153. CMA acted with the intent to deceive or with reckless disregard to the truth of its statements and Plaintiffs' interests. CMA knew of all of the above misrepresentations, omissions and deceptive practices at the time they were made or carried out, but continued them throughout the duration of the unlawful Cherry-Picking scheme due to a strong motive of continued financial gain. CMA enjoyed ill-gotten gains of at least $2,058,514.00 due to the continued scheme.

154.     Through its misrepresentations, omissions and deceptive acts and practices in connection with the sale and purchase of securities, CMA violated the Securities exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

155.     Plaintiffs' justifiably relied on the misrepresentations, omissions and deceptive practices of CMA in making their decision to open their GreatBanc accounts and allow CMA and GreatBanc to co-manage their accounts and effect securities transactions therein.

156.     Plaintiffs' would not have invested in securities through their GreatBanc accounts but for the misrepresentations and omissions made by CMA and the manipulative and deceptive devices or contrivances employed by CMA to carry out and mask the fraudulent Cherry Picking scheme.

157.     CMA's misrepresentations, omissions and deceptive practices proximately caused Plaintiffs and the putative class members' damages. CMA has been unjustly enriched and Plaintiffs and each putative class member have suffered economic loss as a result of the aforesaid conduct of CMA, such damages consisting of:

     a.   Disgorgement of profits for wrongfully allocated trades to the Dushek Family Accounts;

     b.   Recovery of losses from unprofitable trades as a result of the allocation to Plaintiffs' and the putative class' GreatBanc accounts;

     c.   Disgorgement of transaction fees during the period of the Cherry-Picking Scheme;

     d.   Disgorgement of management fees during the period of the Cherry-Picking Scheme; and,

     e.   Loss of profits in Plaintiffs' and the putative class' GreatBanc accounts.

158.    As Defendants have the sole control of the GreatBanc Master Account, GreatBanc Omnibus Account and Dushek Family Account records, only Defendants have full knowledge of the extent of the damage caused to Plaintiffs and the extent that Defendants have been inequitably enriched by their willful misconduct.

159.    Plaintiffs and the putative class members have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiffs and the putative class pray for relief and judgment against Defendant CMA for:

A.  Certification of the putative class as defined herein;

B.  All actual, consequential, foreseeable and compensatory damages caused by CMA's unlawful conduct including loss of interest and reasonable costs;

C.  Disgorgement of profits and fees received by CMA during the Cherry-Picking Scheme; and, in the alternative,

D.  Nominal damages.

### Count II
### Violations of Section 10(b) of the Securities Exchange Act
### of 1934 and Rule 10b-5 Thereunder (as to Defendant Charles Dushek Sr.)

160.    Plaintiffs incorporate paragraphs 1 through 141 above as though fully restated herein.

161.    At all times relevant, Charles Dushek Sr., directly or indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities as described herein, knowingly and recklessly:

a.  Employed devices, schemes or artifices to defraud;

b. Made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or,

c. Engaged in acts, practices and courses of business which operated as a fraud or deceit on Plaintiffs.

162. Charles Dushek Sr., directly or indirectly, employed devices, schemes or artifices to defraud and otherwise engaged in acts, practices and courses of business which operated as a fraud or deceit on Plaintiffs by:

a. Making delayed, unfair and inequitable allocations of profitable trades to CMA employee, owner and proprietary accounts including the Dushek Family Accounts, at the expense of Plaintiffs;

b. Making delayed, unfair and inequitable allocations of unprofitable trades to GreatBanc accounts held by Plaintiffs and the putative class;

c. Excessively trading securities in Plaintiffs' GreatBanc Accounts in order to perpetuate the Cherry-Picking Scheme;

d. Commingling client assets through block trades in securities through the GreatBanc Master Account and GreatBanc Omnibus Account without disclosing the commingling to CMA and GreatBanc clients;

e. Using CMA client accounts, including Plaintiffs' GreatBanc Accounts, to leverage the Dushek Family Accounts without their knowledge;

f. Allowing his son, Chas Dushek, to manage, oversee, execute and allocate trades in GreatBanc accounts despite not being licensed to do so and not informing Plaintiffs of these unlawful practices;

g. Excessively trading in Plaintiffs' GreatBanc Accounts in order to perpetuate the Cherry-Picking Scheme;

h. Making investment decisions relative to the sale and purchase of securities in Plaintiffs' GreatBanc Accounts that were designed to benefit the Dusheks at the Plaintiffs' expense; and,

i. Concealing the wrongful acts of its agents, employees, officers and registered representatives from Plaintiffs at all times relevant.

163.    In taking these actions, Charles Dushek Sr., directly or indirectly, used and employed manipulative and deceptive devices and contrivances in connection with the sale and purchase of securities in Plaintiffs' GreatBanc accounts.

164.    Charles Dushek Sr. knowingly misrepresented to Plaintiffs and prospective clients that:

a. CMA used a separate trading platform to eliminate any conflicts of interest between client and proprietary and personal account trading;

b. This separate trading platform ensured CMA employees, agents or representatives did not make any contemporaneous trades with client and CMA accounts;

c. CMA did not merge or aggregate any client order with any employee order;

d. CMA did not make short term trades in any investment on the same day that CMA clients had open transactions in that same investment;

e. CMA's policy was to allocate investment opportunities on a fair and equitable basis relative to other accounts;

f. Trades would be allocated in a timely manner and on a fair and equitable basis; and,

g. CMA was committed to doing all things in the offering and delivery of its services in a manner that is always in the best interests of the client.

165. Charles Dushek Sr. also knowingly misrepresented to Plaintiffs that CMA supervised the trading activities of its agents, employees and investment advisors and had a compliance officer dedicated to such supervision. At the time of making those misrepresentations, Charles Dushek Sr. knew that:

a. He was the president and compliance officer for CMA and acted as his own supervisor while also acting as the supervisor of Chas Dushek;

b. CMA had no policies or procedures to supervise him in any matter whatsoever;

c. CMA had no policies or procedures to ensure the Dusheks allocated trades at or near the time of execution;

d. CMA willfully refused to make a written allocation policy that would comply with industry standards; and,

e. CMA had no policies to ensure the Dusheks were not disproportionately allocating profitable trades to the Dushek Family Accounts while contemporaneously allocating less profitable or unprofitable trades to Plaintiffs' GreatBanc Accounts and the GreatBanc accounts of the putative class.

166. Charles Dushek Sr. made omissions of the following material facts:

a. Defendants were, at all times relevant, making block trades in securities through the GreatBanc Master Account and GreatBanc Omnibus Account, which commingled the assets of all GreatBanc accounts;

35

b. Defendants were delaying allocations of trades until after the profitability of each trade had been fully determined;

c. The Dusheks were allocating profitable trades to proprietary and personal accounts while allocating unprofitable trades to the accounts of Plaintiffs and the putative class;

d. The Dusheks were trading in securities in the Dushek Family Accounts that were also held by Plaintiffs in their GreatBanc accounts; and,

e. CMA did not supervise the Dusheks or the allocation of trades in the GreatBanc accounts to ensure trading in the GreatBanc accounts met best execution standards;

f. Chas Dushek was not licensed to trade securities, but was actively trading in GreatBanc accounts.

167.    The above stated misrepresentations and omissions were material in that a reasonable investor would consider the matters important in making an investment decision and in allowing Defendants to effectuate securities transactions in their GreatBanc accounts.

168.    Charles Dushek Sr. acted with the intent to deceive or with reckless disregard to the truth of his statements and Plaintiffs' interests. Charles Dushek Sr. knew of all of the above misrepresentations, omissions and deceptive practices at the time they were made or carried out, but continued them throughout the duration of the Cherry-Picking scheme due to a strong motive of continued financial gain. Charles Dushek Sr. and his company, CMA, enjoyed ill-gotten gains of at least $2,058,514.00 due to the continued Cherry-Picking scheme.

169.    The ill-gotten gains from the Cherry-Picking scheme and fees and commissions enabled Charles Dushek Sr. and his family to live an extravagant lifestyle and therefore created

the motive and incentive to continue the Cherry-Picking scheme without any regard to the harm it caused Plaintiffs and the class.

170.    Through his misrepresentations, omissions and deceptive acts and practices in connection with the sale and purchase of securities, Charles Dushek Sr. violated the Securities exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

171.    Plaintiffs' justifiably relied on Charles Dushek Sr.'s misrepresentations, omissions and deceptive practices in making their decision to open their GreatBanc accounts and allow CMA and GreatBanc to co-manage their accounts and effect securities transactions therein.

172.    Plaintiffs' would not have invested in securities through their GreatBanc accounts but for the misrepresentations and omissions made by Charles Dushek Sr. and the manipulative and deceptive devices or contrivances employed by Charles Dushek Sr. to carry out and mask the fraudulent Cherry-Picking scheme.

173.    Charles Dushek Sr.'s misrepresentations, omissions and deceptive practices proximately caused Plaintiffs' and the putative class members' damages. Charles Dushek Sr. has been unjustly enriched and Plaintiffs and each putative class member have suffered economic loss as a result of the aforesaid conduct of CMA, such damages consisting of:

    a.    Disgorgement of profits for wrongfully allocated trades to the Dushek Family Accounts;

    b.    Recovery of losses from unprofitable trades as a result of the allocation to Plaintiffs' and the putative class' GreatBanc accounts;

    c.    Disgorgement of transaction fees during the period of the Cherry-Picking Scheme;

    d.    Disgorgement of management fees during the period of the Cherry-Picking Scheme; and,

e. Loss of profits in Plaintiffs' and the putative class' GreatBanc accounts.

174. As Defendants have the sole control of the GreatBanc Master Account, GreatBanc Omnibus Account and Dushek Family Account records, only Defendants have full knowledge of the extent of the damage caused to Plaintiffs and the extent that Defendants have been inequitably enriched by their willful misconduct.

175. Plaintiffs and the putative class members have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiffs and the putative class pray for relief and judgment against Defendant Charles Dushek Sr. for:

A. Certification of the putative class as defined herein;

B. All actual, consequential, foreseeable and compensatory damages caused by Charles Dushek Sr.'s unlawful actions, including loss of interest and reasonable costs;

C. Disgorgement of profits and fees received by Charles Dushek Sr. during the time of the Cherry-Picking Scheme; and, in the alternative,

D. Nominal damages.

### COUNT III
### Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Thereunder (as to Chas Dushek)

176. Plaintiffs incorporate paragraphs 1 through 141 above as though fully restated herein.

177. At all times relevant, Chas Dushek, directly or indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities as described herein, knowingly and recklessly:

    a.  Employed devices, schemes or artifices to defraud;

    b.  Made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or,

    c.  Engaged in acts, practices and courses of business which operated as a fraud or deceit on Plaintiffs.

178. Chas Dushek, directly or indirectly, employed devices, schemes or artifices to defraud and otherwise engaged in acts, practices and courses of business which operated as a fraud or deceit on Plaintiffs by:

    a.  Making delayed, unfair and inequitable allocations of profitable trades to CMA employee, owner and proprietary accounts including the Dushek Family Accounts, at the expense of Plaintiffs;

    b.  Making delayed, unfair and inequitable allocations of unprofitable trades to GreatBanc accounts held by Plaintiffs and members of the putative class;

    c.  Excessively trading securities in Plaintiffs' GreatBanc Accounts in order to perpetuate the Cherry-Picking Scheme;

    d.  Commingling client assets through block trades in securities in the GreatBanc Master Account and GreatBanc Omnibus Account;

    e.  Using CMA client accounts, including Plaintiffs' GreatBanc Accounts, to leverage the Dushek Family Accounts;

    f.   Managing, overseeing, executing and allocating trades in GreatBanc accounts despite not being licensed to do so\;

    g.   Excessively trading securities in Plaintiffs' GreatBanc Accounts in order to perpetuate the Cherry-Picking Scheme;

    h.   Making investment decisions relative to the sale and purchase of securities in Plaintiffs' GreatBanc Accounts that were designed to benefit the Dusheks at the Plaintiffs' expense; and,

    i.   Concealing the wrongful acts of CMA's agents, employees, officers and registered representatives from Plaintiffs at all times relevant.

179.    In taking these actions, Chas Dushek, directly or indirectly, used and employed deceptive devices and contrivances in connection with the sale and purchase of securities in Plaintiffs' GreatBanc accounts.

180.    Chas Dushek knowingly misrepresented to Plaintiffs that CMA and the Defendants would allocate trades in a timely manner and on a fair and equitable basis.

181.    Chas Dushek knowingly misrepresented to Plaintiffs that CMA supervised its agents, employees and investment advisors and had a compliance officer dedicated to such supervision. At the time of making those representations, Chas Dushek knew that:

    a.   Charles Dushek Sr. was the president and compliance officer for CMA and acted as his own supervisor while also acting as the supervisor of Chas Dushek;

    b.   CMA had no policies or procedures to supervise the Dusheks in any matter whatsoever;

    c.   CMA had no policies or procedures to ensure the Dusheks allocated trades at or near the time of execution;

    d.  CMA willfully refused to make a written allocation policy that would comply with industry standards; and,

    e.  CMA had no policies to ensure the Dusheks were not disproportionately allocating profitable trades to the Dushek Family Accounts while contemporaneously allocating less profitable or unprofitable trades to Plaintiffs' GreatBanc Accounts and the GreatBanc accounts of the putative class.

182.    Chas Dushek made omissions of the following material facts:

    a.  Defendants were, at all times relevant, making block trades through the GreatBanc Master Account and GreatBanc Omnibus Account, which commingled the assets of all GreatBanc accounts;

    b.  Defendants were delaying allocations of trades until after the profitability of each trade had been fully determined;

    c.  The Dusheks were trading in securities in the Dushek Family Accounts that were also held by Plaintiffs in their GreatBanc accounts; and,

    d.  CMA did not supervise the Dusheks or the allocation of trades in the GreatBanc accounts to ensure trading in the GreatBanc accounts met best execution standards;

    e.  Chas Dushek was not licensed to trade securities, but was actively trading in GreatBanc accounts.

183.    The above stated misrepresentations and omissions were material in that a reasonable investor would consider the matters important in making and investment decision and in allowing Defendants to effectuate securities transactions in their GreatBanc accounts.

184.    Chas Dushek acted with the intent to deceive or with reckless disregard to the truth of his statements and Plaintiffs' interests. Chas Dushek knew of all of the above

misrepresentations, omissions and deceptive practices at the time they were made or carried out, but continued them throughout the duration of the Cherry-Picking scheme due to a strong motive of continued financial gain. Chas Dushek, Charles Dushek Sr. and CMA, enjoyed ill-gotten gains of at least $2,058,514.00 due to the continued scheme.

185.    Through these ill-gotten gains, Chas Dushek was able to live a luxurious life far beyond his means had he only been paid a salary for his services. The ill-gotten gains from the scheme and fees and commissions enabled the Dushek family's extravagant lifestyle and created the motive and incentive to continue the Cherry-Picking scheme without any regard to the harm it caused Plaintiffs and the class.

186.    Through his misrepresentations, omissions and deceptive acts and practices, Chas Dushek violated the Securities exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

187.    Plaintiffs' justifiably relied on Chas Dushek misrepresentations, omissions and deceptive practices  in making their decision to open their GreatBanc accounts and allow CMA and GreatBanc to co-manage their accounts and effect securities transactions therein.

188.    Plaintiffs would not have invested in securities through their GreatBanc accounts but for the above stated misrepresentations and omissions and the manipulative and deceptive devices or contrivances employed by Chas Dushek to carry out and mask the fraudulent Cherry Picking Scheme.

189.    Chas Dushek's misrepresentations, omissions and deceptive practices proximately caused Plaintiffs and the putative class members' damages. CMA has been unjustly enriched and Plaintiffs and each putative class member have suffered economic loss as a result of the aforesaid conduct of CMA, such damages consisting of:

42

a. Disgorgement of profits for wrongfully allocated trades to the Dushek Family Accounts;

b. Recovery of losses from unprofitable trades as a result of the allocation to Plaintiffs' and the putative class' GreatBanc accounts;

c. Disgorgement of transaction fees during the period of the Cherry-Picking Scheme and breaches of duty;

d. Disgorgement of management fees during the period of the Cherry-Picking Scheme and breaches of duty; and,

e. Loss of profits in Plaintiffs' and the putative class' GreatBanc accounts.

190.     As Defendants have the sole control of the GreatBanc Master Account, GreatBanc Omnibus Account and Dushek Family Account records, only Defendants have full knowledge of the extent of the damage caused to Plaintiffs and the extent that Defendants have been inequitably enriched by their willful misconduct.

191.     Plaintiffs and the putative class members have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiffs and the putative class pray for relief and judgment against Defendant Chas Dushek for:

A.  Certification of the putative class as defined herein;

B.  All actual, consequential, foreseeable and compensatory damages caused by Chas Dushek's unlawful actions including loss of interest and reasonable costs;

C.  Disgorgement of profits and fees received by Chas Dushek during the time of the unlawful Cherry-picking scheme; and, in the alternative,

D.  Nominal damages.

## Count IV
## Violations of Section 10(b) of the Securities Exchange Act
## of 1934 and Rule 10b-5 Thereunder (as to Defendant GreatBanc)

192.    Plaintiffs incorporate paragraphs 1 through 141 above as though fully restated herein.

193.    At all times relevant, GreatBanc acted as the account manager relative to Plaintiffs' GreatBanc Accounts and engaged in the business of effecting transactions in securities in Plaintiffs' GreatBanc Accounts.

194.    GreatBanc performed execution services, consummated securities transactions with payment and delivery, allocated purchases of securities, performed settlement services and ensured receipt and delivery of all securities traded in Plaintiffs' GreatBanc accounts. In performing these services, GreatBanc received transactional fees for each security purchased and sold.

195.    At all times relevant, GreatBanc, directly or indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities as described herein, knowingly and recklessly:

    a.  Employed devices, schemes or artifices to defraud;

    b.  Made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or,

    c.  Engaged in acts, practices and courses of business which operated as a fraud or deceit on Plaintiffs.

196.    GreatBanc employed devices, schemes or artifices to defraud and otherwise engaged in acts, practices and courses of business which operated as a fraud or deceit on Plaintiffs by:

a. Making delayed, unfair and inequitable allocations of profitable trades to CMA employee, owner and proprietary accounts including the Dushek Family Accounts;

b. Making delayed, unfair and inequitable allocations of unprofitable and less profitable trades to Plaintiffs' GreatBanc accounts;

c. Allowing the Dusheks to trade in the same securities in their personal GreatBanc accounts that Plaintiffs' held in their GreatBanc accounts by and through making block trades in the GreatBanc Master Account and GreatBanc Omnibus Account;

d. Excessively trading securities in Plaintiffs' GreatBanc Accounts in order to perpetuate the Cherry-Picking Scheme;

e. Commingling client assets through block trades in the GreatBanc Master Account and GreatBanc Omnibus Account;

f. Using CMA client accounts, including Plaintiffs' GreatBanc Accounts, to leverage the Dushek Family Accounts through block trading in the GreatBanc Master Account and GreatBanc Omnibus Account;

g. Managing, overseeing, executing and allocating trades in CMA investment accounts despite not being licensed to do so;

h. Concealing the wrongful acts of CMA's agents, employees, officers and registered representatives from Plaintiffs at all times relevant.

197. In taking these actions, GreatBanc, directly or indirectly, used and employed manipulative and deceptive devices and contrivances in connection with the sale and purchase of securities in Plaintiffs' GreatBanc accounts.

198.   By and through the Investment Advisory Agreements and custody agreements, which were incorporated by and attached to one another, GreatBanc knowingly misrepresented to Plaintiffs that:

    a.   CMA and the Defendants would allocate trades in a timely manner and on a fair and equitable basis;

    b.   CMA supervised its agents, employees and investment advisors and had a compliance officer dedicated to such supervision;

    c.   GreatBanc would take responsibility for the safekeeping of the assets held in the GreatBanc accounts.

199.   GreatBanc made omissions of the following material facts:

    a.   Defendants were, at all times relevant, making block trades through the GreatBanc Master Account and GreatBanc Omnibus Account, which commingled the assets of all GreatBanc accounts;

    b.   Defendants were delaying allocations of trades until after the profitability of each trade had been fully determined;

    c.   The Dusheks were trading in securities in the Dushek Family Accounts that were also held by Plaintiffs in their GreatBanc accounts;

    d.   CMA did not use separate trading platforms for proprietary and client trades;

    e.   CMA did not supervise the Dusheks or the allocation of trades in the GreatBanc accounts to ensure trading in the GreatBanc accounts met best execution standards;

    f.   The special settlement rates for trading in the GreatBanc Omnibus Account were costing GreatBanc clients twice as much,

g.    CMA had no policies or procedures to ensure the Dusheks allocated trades at or near the time of execution;

h.    CMA had no policies to ensure the Dusheks were not disproportionately allocating profitable trades to the Dushek Family Accounts while contemporaneously allocating less profitable or unprofitable trades to Plaintiffs' GreatBanc Accounts and the GreatBanc accounts of the putative class;

i.    Chas Dushek was not licensed to trade securities, but was actively trading in GreatBanc accounts;

j.    The Dusheks were making profits in the Dushek Family Accounts that were not proportionate to the assets held in those accounts;

k.    CMA did not have a written trade allocation policy.

200.    In the account statements prepared for Plaintiffs and the class, GreatBanc never included any information indicating:

a.    Trades were being allocated to the GreatBanc accounts after the market had closed and profitability had already been determined;

b.    Client assets were being commingled in block trades;

c.    Overdrafts caused in the GreatBanc accounts due to improper allocation practices;

d.    Chas Dushek was making trades in the GreatBanc accounts without any license to do so;

e.    GreatBanc had imposed fines upon CMA for its failure to allocate trades in a timely manner;

f.    GreatBanc was receiving 100% of all transaction fees as of 2008.

201. GreatBanc knew of the misrepresentations CMA made to Plaintiffs' and prospective clients concerning its use of separate trading platforms, aggregating client orders and employee orders, and employees trading in the same securities as clients. With this knowledge, and with reckless disregard of the risk of harm to the Plaintiffs, GreatBanc did not provide Plaintiffs' with any additional information that would make these misrepresentations not misleading in light of the circumstances under which they were made. Rather, GreatBanc informed clients that communications concerning their accounts should go through CMA.

202. Combined with the afore stated acts, practices and courses of business engaged in by GreatBanc, the above stated misrepresentations and omissions were manipulative and deceptive devices or contrivances employed by GreatBanc in connection with the sale and purchase of securities in Plaintiffs' GreatBanc accounts.

203. The above stated misrepresentations and omissions were material in that a reasonable investor would consider the matters important in making an investment decision and in allowing Defendants to effect securities transactions in their GreatBanc accounts.

204. The above stated omissions and misrepresentations presented a danger of misleading Plaintiffs' that was either known to GreatBanc or so obvious that GreatBanc must have been aware of the danger.

205. GreatBanc acted with an extreme departure from the standards of ordinary care and with reckless disregard of a substantial risk that Plaintiffs' would suffer harm due to the:

    a. Delayed allocation of trades until after the profit or loss of each trade had been determined;

    b. Complete lack of supervision of trading activity;

    c.   Commingling of client assets and employee assets in the GreatBanc Master Account and GreatBanc Omnibus Account;

    d.   Improper record keeping relative to the GreatBanc accounts;

    e.   Repeated problems with overdrafting in GreatBanc accounts;

    f.   Constant issues with "DK'ing" trades;

    g.   Unallocated block trading through the GreatBanc Master Account and GreatBanc Omnibus Account;

    h.   Unlicensed trading and investment advisory services by Chas Dushek in the GreatBanc accounts;

    i.   Lack of any written policies concerning the allocation of trades;

    j.   Disproportionate returns earned in the Dushek Family Accounts compared to the assets held in those accounts; and,

    k.   Use of the same trading platform for employee and client accounts.

206.    GreatBanc acted with the intent to deceive, manipulate or defraud or otherwise acted with reckless disregard to the truth of its statements and Plaintiffs' interests. GreatBanc knew of all of the above misrepresentations, omissions and deceptive practices at the time they were made or carried out, but continued them throughout the duration of the Cherry-Picking scheme due to a strong motive of continued financial gain.

207.    Along with asset based fees, GreatBanc received commissions and fees on every securities transaction in the GreatBanc accounts. GreatBanc even raised this transactional fee to increase its profit during the time of the Cherry-Picking scheme. As of 2009, GreatBanc also began penalizing CMA with $500.00 charges for each time that GreatBanc had to get involved with end of day issues. Unbeknownst to Plaintiffs and the putative class, GreatBanc also profited from

CMA's overdrafting of client accounts and received twice the usual transaction fee for special settlements through the GreatBanc Omnibus Account. Thus, rather than disclose these issues to GreatBanc account holders, GreatBanc's solution was to keep making profits and keep the scheme going.

208.    Through its misrepresentations, omissions and deceptive acts and practices in connection with the sale and purchase of securities in Plaintiffs' GreatBanc accounts, GreatBanc violated the Securities exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

209.    Plaintiffs' justifiably relied on GreatBanc's misrepresentations, omissions and deceptive practices  in making their decision to open their GreatBanc accounts and allow CMA and GreatBanc to co-manage their accounts and effect securities transactions therein.

210.    Plaintiffs would not have invested in securities through their GreatBanc accounts but for the misrepresentations and omissions made by GreatBanc and the manipulative and deceptive devices or contrivances employed by GreatBanc to carry out and mask the fraudulent Cherry-Picking scheme.

211.    GreatBanc's misrepresentations, omissions and deceptive practices proximately caused Plaintiffs and the putative class members' damages. GreatBanc has been unjustly enriched and Plaintiffs and each putative class member have suffered economic loss as a result of the aforesaid conduct of CMA, such damages consisting of:

> a. Disgorgement of profits for wrongfully allocated trades to the Dushek Family Accounts;
>
> b. Recovery of losses from unprofitable trades as a result of the allocation to Plaintiffs' GreatBanc accounts and the accounts of the putative class;

c. Disgorgement of transaction fees during the period of the Cherry-Picking Scheme;

d. Disgorgement of management fees during the period of the Cherry-Picking Scheme; and,

e. Loss of profits in Plaintiffs' and the putative class' GreatBanc accounts.

212. As Defendants have the sole control of the GreatBanc Master Account, GreatBanc Omnibus Account and Dushek Family Account records, only Defendants have full knowledge of the extent of the damage caused to Plaintiffs and the extent that Defendants have been inequitably enriched by their willful misconduct and extreme departure from the standards of ordinary care.

213. Plaintiffs and the putative class members have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiffs and the putative class pray for relief and judgment against Defendant GreatBanc for:

A. Certification of the putative class as defined herein;

B. All actual, consequential, foreseeable and compensatory damages caused by GreatBanc's unlawful conduct including loss of interest and reasonable costs;

C. Disgorgement of profits and fees received by GreatBanc during the time of breach; and, in the alternative,

D. Nominal damages.

Respectfully Submitted,

/s/ Vincent L. DiTommaso
One of Plaintiffs' Attorneys

John S. Burke (No. 6208743)          Vincent L. DiTommaso
Jordan B. Dorrestein  (No. 6308902)  John Auchter
Higgins & Burke, P.C.                DiTommaso Lubin

51

2560 Foxfield Rd., Suite 200
St. Charles, IL 60174
(630) 762-9081
**Service via email accepted at:**
jburke@higginsandburke.com
jdorrestein@higginsandburke.com

17W 220 22nd St., Suite 410
Oakbrook Terrace, IL 60181
(630) 333-0000
**Service via email accepted at:**
vdt@ditommasolaw.com
works@ditommasolaw.com

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| PATRICIA POMEROY, ENOCH ANDERSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | |
| GREATBANC TRUST COMPANY, an | ) | |
| Illinois Corporation, CAPITAL MANAGEMENT | ) | |
| ASSOCIATES, an Illinois Corporation, | ) | |
| CHARLES J. DUSHEK, CHARLES S. | ) | |
| DUSHEK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CERTIFICATION OF PATRICIA POMEROY

Patricia Pomeroy, being first duly sworn on oath, deposes and states that, if called to

testify in this matter, I could competently testify to the following based on firsthand knowledge.

1.      I am one of the Plaintiffs in this matter.

2.      I have reviewed the Class Action Complaint and I authorize its filing.

3.      I did not purchase the security that is the subject of the Class Action Complaint at

the direction of my counsel or in order to participate in any private action arising under this title,

15 USCS §§ 78a *et seq.*

4.      I am willing to serve as a representative party on behalf of a class, including

providing testimony at deposition and trial, if necessary.

5.      Other than depositing funds into my GreatBanc accounts I did not make any

specific transactions in the security that is the subject of the Class Action Complaint. CMA,

Charles Dushek Sr., and GreatBanc were the only parties which made transaction in the security

Charles Dushek Sr., and GreatBanc were the only parties which made transaction in the security that is the subject of this Class Action Complaint.

      6.     I have not filed any other action under this title, 15 U.S.C.S. §§ 78a *et seq.*, during the 3-year period preceding the date on which the certification is signed by me, in which I sought to serves as a representative party on behalf of a class; and

      7.     I will not accept any payment for serving as a representative party on behalf of class beyond the pro rata share of any recovery, except as ordered or approved by the court in accordance with title 15 USCS §§ 78u-4(a)(4).

      FURTHER, DECLARANT SAYETH NAUGHT.

      Pursuant to 28 U.S.C. § 1756, I declare under penalty of perjury that the foregoing is true and correct.

Executed on July **31**, 2014

                                                       Patricia Pomperoy

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| PATRICIA POMEROY, ENOCH ANDERSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | |
| GREATBANC TRUST COMPANY, an | ) | |
| Illinois Corporation, CAPITAL MANAGEMENT | ) | |
| ASSOCIATES, an Illinois Corporation, | ) | |
| CHARLES J. DUSHEK, CHARLES S. | ) | |
| DUSHEK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CERTIFICATION OF ENOCH ANDERSON

Enoch Anderson, being first duly sworn on oath, deposes and states that, if called to testify in this matter, I could competently testify to the following based on firsthand knowledge.

1. I am one of the Plaintiffs in this matter.

2. I have reviewed the Class Action Complaint and I authorize its filing.

3. I did not purchase the security that is the subject of the Class Action Complaint at the direction of my counsel or in order to participate in any private action arising under this title, 15 USCS §§ 78a *et seq.*

4. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5. Other than depositing funds into my GreatBanc accounts I did not make any specific transactions in the security that is the subject of the Class Action Complaint. CMA,

Charles Dushek Sr., and GreatBanc were the only parties which made transaction in the security that is the subject of this Class Action Complaint.

6. I have not filed any other action under this title, 15 U.S.C.S. §§ 78a *et seq.*, during the 3-year period preceding the date on which the certification is signed by me, in which I sought to serves as a representative party on behalf of a class; and

7. I will not accept any payment for serving as a representative party on behalf of class beyond the pro rata share of any recovery, except as ordered or approved by the court in accordance with title 15 USCS §§ 78u-4(a)(4).

FURTHER, DECLARANT SAYETH NAUGHT.

Pursuant to 28 U.S.C. § 1756, I declare under penalty of perjury that the foregoing is true and correct.

Executed on July _31_, 2014

Enoch Anderson